**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**GRANT & EISENHOFER P.A.**
Elizabeth Graham (Cal. Bar No. 143085)
egraham@gelaw.com
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel: (415) 229-9720

Jennifer Sarnelli (Cal. Bar No. 242510)
jsarnelli@gelaw.com
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

Kelly L. Tucker (*pro hac vice forthcoming*)
ktucker@gelaw.com
123 Justison Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

**SEEGER WEISS LLP**
Stephen A. Weiss, Esq.(*pro hac vice* forthcoming)
sweiss@seegerweiss.com
Justin M. Smigelsky, Esq.
jsmigelsky@seegerweiss.com (*pro hac vice* forthcoming)
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
*Attorneys for Plaintiffs and the Putative Classes*

| | |
|---|---|
| BENJAMIN SPENCER, SHAUN PILON, DAMANY BROWNE, and LYNN GUENTHER, on behalf of themselves and all others similarly situation,<br><br>Plaintiffs,<br><br>v.<br><br>PHARMAVITE LLC,<br><br>Defendant. | CASE NO.<br><br><u>CLASS ACTION COMPLAINT</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs Benjamin Spencer, Shaun Pilon, Damany Browne, and Lynn Guenther ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action suit for damages and equitable relief against Pharmavite LLC ("Pharmavite" or "Defendant") for its (1) violations of the California Unfair Competition Law, Bus. & Prof. Code § 17200 et seq.; (2) violations of the California False Advertising Law, Bus. & Prof. Code § 17500 et seq.; (3) violations of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; (4) violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.; (5) violations of the New York Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349 (6) violations of the New York False Advertising Law, N.Y. Gen. Bus. Law § 350; (7) breach of express warranty; (8) breach of implied warranty; and (9) unjust enrichment.

Plaintiffs allege the following based upon personal information as to allegations regarding themselves, and the investigation of their counsel and on information and belief as to all other allegations.

## I. NATURE OF THE ACTION

1. This is a consumer protection class action arising from Defendant's manufacture, sale, and marketing of their Nature Made 500 mg Turmeric Curcumin Capsules (the "Turmeric Capsules").

2. Turmeric is one of the world's most widely used supplements and has been taken or consumed around the world for its medical benefits for thousands of years. The bioactive compound in turmeric is curcumin. When absorbed by the body, curcumin provides antioxidant benefits, supports a healthy inflammation response, and improves joint and muscle health, among other benefits.

3. On its own, the curcumin in turmeric has extremely poor bioavailability due to rapid metabolism and limited absorption. Indeed, "in humans, after a dose of 2 g [2,000 mg] curcumin alone, serum levels were either undetectable or very low."[1] In other words, by itself, curcumin in turmeric cannot be absorbed by the body effectively, and, accordingly, will not provide the health benefits curcumin can offer.

4. Effective turmeric supplements incorporate absorption-enhancing additives or delivery systems—such as lipid complexes, hydrophilic carrier systems, phytosomes, micelles, or most commonly, piperine, which is found in black pepper. Piperine is inexpensive, widely used, and has been shown to increase curcumin bioavailability by up to 2,000%.

5. Defendant advertises its Nature Made-brand Turmeric Capsules as providing "antioxidant benefits" that reduce "free radicals."

6. These representations are deceptive, false, or misleading and omit material information as to the central function of the Turmeric Capsules.

7. Unlike other turmeric supplements manufactured by Nature Made and by other supplement manufacturers, the Turmeric Capsules contain no absorption-enhancing additive necessary to provide the advertised health benefits. Because the curcumin in the Turmeric Capsules cannot effectively be absorbed by the body, they are incapable of providing the "antioxidant" benefits advertised.

---

[1] Guido Shoba et al., *Influence of Piperine on the Pharmacokinetics of Curcumin in Animals and Human Volunteers*, 64 PLANTA. MED. 353 (May 1998), *available at* https://pubmed.ncbi.nlm.nih.gov/9619120/.

8. Consumers reasonably rely on Defendant's representations as to the health and antioxidant benefits of its Turmeric Capsules when they purchase the supplement. Instead, Defendant sells its consumers turmeric that is no different than the turmeric sold in the spice aisle of the grocery store sold at one-tenth of the price (or less) for the same curcumin dose.

9. Defendant knew or should have known that its claims of health benefits of the Turmeric Capsules were baseless, and they were worth far less than the price at which Defendant sold them, among other reasons, because Defendant sold other turmeric products that contained the additional ingredients necessary to promote bioavailability.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 Class members are involved; and many members of the proposed Classes are citizens of different states than Defendant.

11. This Court has personal jurisdiction over Defendant because its United States headquarters is located in West Hills, California, and because Defendant committed the tortious acts alleged herein in California, regularly conducts business in this District, and has extensive contacts with this forum.

12. Defendant purposefully availed itself of the California market, and thus of the benefits of the laws of the State, during all times relevant to this Complaint, so as to render California courts' exercise of jurisdiction over Defendant consistent with traditional notions of fair play and substantial justice.

13. Defendant has physical locations in California.

14. Defendant is transacting or has transacted substantial business in California; has or does derive substantial revenue in California or engages in a persistent course of conduct in California; and has intentionally engaged in conduct aimed at California residents, which has caused harm it knew was likely to be incurred in California.

15. Venue is proper in this Court because Plaintiff Spencer and many class members reside in this district. Furthermore, substantial part of the actions and inactions giving rise to Plaintiffs' claims occurred in this district.

## III. THE PARTIES

### A. Plaintiffs

16. Plaintiff Benjamin Spencer ("Plaintiff Spencer") is a resident of Hoopa, California. In 2026, Plaintiff Spencer purchased Turmeric Capsules from Walmart for personal use, based and in reliance on Nature Made's advertisements that the products he purchased were anti-inflammatory and contained antioxidants. Plaintiff Spencer purchased the Turmeric Capsules to alleviate pain associated with past injuries. Plaintiff Spencer did not know the Turmeric Capsules contained no absorption-enhancing additive(s) necessary to provide the advertised health benefits. Plaintiff Spencer would not have purchased the Turmeric Capsules if that information had been fully disclosed. He would however, purchase the Turmeric Capsules again in the future if he could be certain the Turmeric Capsules contained additives that made them bioavailable.

17. Plaintiff Shaun Pilon ("Plaintiff Pilon") is a resident of Sylmar, California. Plaintiff Pilon purchased Turmeric Capsules from Ralphs (Kroger Grocery Store) for personal use from approximately March 2020 through the present, based and in reliance on Nature Made's advertisements that the products he purchased were anti-inflammatory and contained antioxidants. Plaintiff Pilon purchased the Turmeric Capsules to alleviate pain associated with past injuries, gout and arthritis. Plaintiff Pilon did not know the Turmeric Capsules contained no absorption-enhancing additive(s) necessary to provide the advertised health benefits. Plaintiff Pilon would not have purchased the Turmeric Capsules if that information had been fully disclosed. He would however, purchase the Turmeric Capsules again in the future if he could be certain the Turmeric Capsules contained additives that made them bioavailable.

18. Plaintiff Damany Browne ("Plaintiff Browne") is a resident of Brooklyn, New York. Plaintiff Browne purchased Turmeric Capsules from Walgreens, Target, and CVS for personal use from January 2026 to the present based and in reliance on Nature Made's advertisements that the products he purchased would reduce inflammation and provide antioxidants. Plaintiff Browne did not know the Turmeric Capsules contain no absorption-enhancing additive necessary to provide the advertised health benefits. Plaintiff Browne would not have purchased the Turmeric Capsules if that information had been fully disclosed. He would, however, purchase the Turmeric Capsules again in the future, if he could be certain the Turmeric Capsules contained additives that made them bioavailable.

19. Plaintiff Lynn Guenther ("Plaintiff Guenther") is a resident of Bayville, New Jersey. Plaintiff Guenther purchased Turmeric Capsules from ShopRite, Walmart, and Amazon for personal use over the since approximately 2023 based and in reliance on Nature Made's advertisements that the products he/she purchased would reduce inflammation. Plaintiff Guenther did not know the Turmeric Capsules contain no absorption-enhancing additive necessary to provide the advertised health benefits. Plaintiff Guenther would not have purchased the Turmeric Capsules if that information had been fully disclosed. She would, however, purchase the Turmeric Capsules again in the future, if she could be certain the Turmeric Capsules contained additives that made them bioavailable.

20. Plaintiffs were unaware the Turmeric Capsules would not provide the stated antioxidant and anti-inflammatory benefits, because they did not contain additives necessary to make the curcumin they contain bioavailable.

21. No reasonable consumer would pay ten times the price of a functionally identical product for a product that had functionally no utility and could not offer the health benefits advertised. Plaintiffs would not have purchased the Turmeric Capsules had they have known that they would not offer the advertised health benefits.

**B. Defendant**

22. Defendant Pharmavite LLC is a California limited liability company with its principal place of business at 8531 Fallbrook Ave., West Hills, California 91304.

23. Defendant manufactures, advertises, markets, labels, distributes, and sells its Turmeric Capsules as part of its Nature Made brand of products.

24. Defendant knowingly created, oversaw and authorized the unlawful, fraudulent, unfair, misleading, and deceptive packaging and related marketing for the Turmeric Capsules that represented those products offered health benefits it did not, and did not disclose that the Turmeric Capsules did not contain additives necessary to provide the promised health benefits, rendering their Turmeric Capsules worth no more than ground turmeric sold as a spice in the grocery aisle.

## FACTUAL ALLEGATIONS

25. The market for supplements is lucrative, robust, and growing substantially. According to financial analysts, retail sales of dietary supplements in the United States reached $68.74 billion in 2025 and are expected to grow to an estimated $131.8 billion by 2033.[2]

---

[2] Grand View Research, Abstract, U.S. DIETARY SUPPLEMENTS MARKET SIZE, INDUSTRY REPORT (2026-2033), *at* https://www.grandviewresearch.com/industry-analysis/us-dietary-supplements-market-report#:~:text=The%20U.S.%20dietary%20supplements%20market, growing%20focus%20on%20preventive%20healthcare (last visited May 29, 2026).




26. According to one industry analyst, in 2025, 23.9% of revenue earned from the sale of herbal supplements globally was derived from turmeric sales.[3] In 2021, turmeric supplement sales in the United States generated an estimated $151.7 million in revenue, growing from $25.6 million in 2013.[4]

27. Turmeric's popularity has continued to surge. A 2025 survey of 8,850 supplement users ranked turmeric supplements as the 14th most popular supplement among the 200 most commonly used products—more popular than protein bars, melatonin, and calcium.[5]

28. Unfortunately, many supplements, including Defendant's Turmeric Capsules, are sold to unsuspecting consumers looking to improve their health but the "truth is, there are a lot of products that don't work at all. Typically, this is because they don't contain the right

[3] HERBAL SUPPLEMENT MARKET, GLOBAL MARKET ANALYSIS REPORT (2025-2035) (Dec. 1, 2025), *available at* https://www.factmr.com/report/herbal-supplement-market.

[4] Ly Nguyen et al., *Turmeric Trends: Analyzing Consumer Preferences and Willingness to Pay*, FRONTIERS IN SUSTAINABLE FOOD SYS. (2024), *available at* https://www.frontiersin.org/journals/sustainable-food-systems/articles/10.3389/fsufs.2024.1359040/full.

[5] Press Release, ConsumerLab.com, ConsumerLab Survey Shows Growth in Creatine and Magnesium Supplements (Feb. 26, 2026), *at* https://www.consumerlab.com/news/2026-supplement-popularity-press-release/02-26-2026.

ingredients or the right proportions. A lot of interested consumers don't realize how exact a science creating an effective supplement really is."[6]

### C. Curcumin: Bioavailability and Health Benefits

29. Turmeric has long been used as an anti-inflammatory remedy in both Indian and Chinese medicine and in the past several decades has become a staple in the modern supplement aisle.[7] When absorbed at sufficient levels by the body, it works as a natural remedy for inflammation, joint discomfort, aging, and chronic disease, it is consumed daily by millions of Americans seeking relief from arthritis, respiratory conditions, and other ailments. These health benefits derive from turmeric's bioactive component—curcumin.[8]

30. The chemical name for curcumin is diferuloylmethane ($C_{21}H_{20}O_6$). Curcumin is a "renowned polyphenol with a broad spectrum of health properties."[9] When absorbed by the body, curcumin has well-studied antioxidant properties. Antioxidants are associated with reducing the risk of chronic diseases such as cancer, heart disease, and Alzheimer's disease, supporting brain and eye health, slowing aging, and strengthening immunity.[10] But, the health benefits of curcumin depend on the systemic absorption of curcumin by the body when ingested.[11]

---

[6] Consumer Review, Is Your Turmeric Effective?, *at* https://consumereview.org/reviews/turmeric (last visited May 29, 2026).

[7] Michele Dei Cas & Riccardo Ghidoni, *Review, Dietary Curcumin: Correlation between Bioavailability and Health Potential*, 11 NUTRIENTS 2147 (2019), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC6770259/pdf/nutrients-11-02147.pdf.

[8] Preetha Anand et al., *Bioavailability of Curcumin: Problems and Promises*, 4 MOL. PHARMACEUTICS 807 (2007), *available at* https://pubs.acs.org/doi/10.1021/mp700113r (last visited May 29, 2026).

[9] Dei Cas & Ghidoni, *supra* n.7.

[10] Elizabeth H. Shanks, *10 Benefits of Antioxidants - Natural Health*, The Alabama Pecan Co. (July 24, 2018), *at* https://www.alabamapecanco.com/post/10-benefits-of-antioxidants-natural-health (last visited May 29, 2026).

[11] Giuseppe Garcea et al., *Consumption of the Putative Chemopreventive Agent Curcumin by Cancer Patients: Assessment of Curcumin Levels in the Colorectum and their Pharmacodynamic Consequences*, 14 CANCER EPIDEMIOL. BIOMARKERS & PREVENTION 120 (2005) ("The concentrations of curcumin required to elicit biochemical changes germane to chemoprevention in experiments in vitro are in the 5 to 50 Nmol/L range."); *id.* at 122 (reporting results showing that patients taking a 450 mg dose of curcumin daily had no curcumin detected in their normal



[12]

31. Decades of research shows crude curcumin has "poor gut absorption, rapid metabolism, and systemic elimination of curcumin that significantly restricts its bioavailability."[13,14] Several studies demonstrated that crude curcumin was unmeasurable in the body after ingestion, even in cases where the subjects ingested more than seven times (3,600 mg) the curcumin in Defendant's Turmeric Capsules, and entirely undetectable at doses equivalent to Defendant's Turmeric capsules.[15] Other studies confirm this finding—that

(non-cancerous) tissue); *id.* at 123 ("The lack of quantifiable curcumin in the plasma observed here, even after a dose as high as 3,600 mg is consistent with recent clinical reports, in which oral doses of 30 to 180 mg curcumin failed to establish detectable plasma levels, and doses of 4,000 to 12,000 mg yielded curcumin peak levels of only 0.5 to 2 Amol/L within 1 hour of administration.") (internal citations omitted).

[12] Image of Health Benefits of Curcumin, Varalakshmi Pratti et al., *Investigating Bioavailability of Curcumin and Piperine Combination in Comparison to Turmeric Rhizomes: An in vitro Study*, 16 J. EXPERIMENTAL PHARMACOLOGY 37, 44 (2024), *available at* https://pubmed.ncbi.nlm.nih.gov/38312742/.

[13] Mangala Hegde et al., *Review: Curcumin Formulations for Better Bioavailability: What We Learned from Clinical Trials Thus Far*, 8 ACS OMEGA 10713, 10714 (2023), *available at* https://pubs.acs.org/doi/pdf/10.1021/acsomega.2c07326?ref=article_openPDF.

[14] Dei Cas & Ghidoni, *supra* n.7.

[15] *Id.*

"systemic bioavailability of curcumin after oral intake can be expected to be virtually zero,"[16] meaning when ingesting curcumin by itself, only a small fraction (if any) of the ingested compound ultimately reaches systemic circulation.[17]

32. Accordingly, while the benefits from the consumption of curcumin are well-established, its bioavailability (the rate and extent of the ingredient that is absorbed by the body) renders it unable to offer curcumin's health benefits when ingesting curcumin alone.[18]

33. To be absorbed in the intestines, a substance first has to dissolve in the fluids of the digestive tract, and curcumin does this poorly. Only a limited amount is available to pass through the intestinal wall. As a result, the curcumin cannot be absorbed on its own because it does not dissolve in water, and therefore ends up mostly excreted in urine and stool.[19]

34. Even when some curcumin does dissolve, absorption is still incomplete—much of it stays in the gut and is eventually eliminated from the body. In addition, the small amount that is absorbed is quickly broken down by the body into other compounds, which further reduces how much active curcumin enters the bloodstream. [20]

35. The main reason curcumin does not reach the bloodstream in meaningful amounts is that it is quickly broken down by the body after it is absorbed. This process, known as first-pass metabolism, occurs in both the intestines and the liver. [21]

---

[16] Pratti, *supra* n.12.

[17] Shoba, *supra* n.1 ("in humans after a dose of 2 g curcumin alone, serum levels were either undetectable or very low").

[18] Anand, *supra* n.8.

[19] Manfred Metzler et al., *Curcumin Uptake and Metabolism*, 39 BIOFACTORS 14 (2013), *available at* https://iubmb.onlinelibrary.wiley.com/doi/10.1002/biof.1042.

[20] Anand, *supra* n.8.; Susan J. Hewlings & Douglas S. Kalman, *Curcumin: A Review of Its Effects on Human Health*, 6 FOODS 92 (2017), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC5664031/.

[21] Anand, *supra* n.8.

36. Enzymes in these tissues rapidly convert curcumin into other forms—primarily glucuronides and sulfates—that are easier for the body to eliminate. These converted forms are quickly excreted.[22]

37. As a result, very little active curcumin remains in circulation, even if some is initially absorbed in the gut. In other words, simply being absorbed into intestinal cells does not mean curcumin will reach the bloodstream in an active form, because much of it is metabolized before it can circulate throughout the body.

38. Because curcumin is so poorly absorbed, researchers have spent significant effort trying to improve how much of it the body can use.

39. To ensure absorption, turmeric supplements need an effective delivery system, such as a: lipid complex, hydrophilic carrier system, phytosome, micelle, or piperine.[23]

40. One of the most common and effective methods for absorption is to take curcumin with piperine, an alkaloid compound found in black pepper.

41. While other additives can be used to increase the bioavailability of curcumin in turmeric supplements, piperine is most commonly used because it is inexpensive and effective.

42. Piperine helps by slowing down the body's ability to break curcumin down, increasing how much passes through the intestinal wall, and reducing how quickly it is eliminated. In a well-known human study, adding a small amount of piperine to curcumin increased its bioavailability by about 2,000 percent, showing how strongly metabolism limits curcumin's effectiveness.[24]

---

[22] Sandra Flory et. al., *Increasing Post-Digestive Solubility of Curcumin Is the Most Successful Strategy to Improve its Oral Bioavailability: A Randomized Cross-Over Trial in Healthy Adults and In Vitro Bioaccessibility Experiments,* 65 MOLECULAR NUTRITION FOOD RSCH. 24 (2021), *available at* https://onlinelibrary.wiley.com/doi/10.1002/mnfr.202100613#:~:"text=The%20lipophilic%20phytochemical%20curcumin%20from,causing%20its%20low%20systemic%20bioavailability.

[23] Subash C. Gupta et al., *Therapeutic Roles of Curcumin: Lessons Learned from Clinical Trials*, 15 AAPS J. 195 (2013), *available at* https://pubmed.ncbi.nlm.nih.gov/23143785/.

[24] Shoba, *supra* n.1.

43. Additional formulations have also been designed to help curcumin dissolve better and pass more easily into the bloodstream. They include lipid-based systems (such as micelles and emulsions), nanoparticles that increase surface area, and phospholipid complexes (often called phytosomes) that improve absorption through cell membranes.[25]

44. Other approaches use compounds that stabilize curcumin or help it mix with water. These technologies can greatly increase how much curcumin the body absorbs—sometimes by 10 to 50 times compared to basic curcumin. This shows that how curcumin is formulated is often more important than how much is taken.[26]

45. Without such enhancement, curcumin remains minimally bioavailable. Supplements lacking absorption aids cannot reasonably be expected to deliver meaningful antioxidant or joint-support benefits.

46. As one nutraceutical Research & Development head noted, "Without enhanced bioavailability, you're just selling orange powder."[27]

**D. Nature Made's Turmeric Capsules**

47. Defendant is one of the top supplement manufacturers in the United States. Its Nature Made products are available nationwide in retailers such as BJ's Wholesale Club, Target, Wal-Mart, CVS, Walgreens, and online retailers such as Amazon.

48. Defendant markets its Nature Made brand as a premium, science-driven brand that consumers can trust for safe, effective, and high-quality dietary supplements.

49. Defendant markets its Nature Made products as part of a leading and highly trusted vitamin brand. In its marketing and labeling, Defendant emphasizes that Nature Made

---

[25] Gupta, *supra* n.23.

[26] Sahdeo Prasad & Bharat B. Aggarwal, *Turmeric, The Golden Spice: From Traditional Medicine to Modern Medicine, in* HERBAL MEDICINE: BIOMOLECULAR & CLINICAL ASPECTS (Iris F. F. Benzie & Sissi Wachtel Galor eds., 2nd ed. 2011), *available at* https://www.ncbi.nlm.nih.gov/books/NBK92752/.

[27] STRATEGIC MARKET RESEARCH, TURMERIC SUPPLEMENT MARKET SIZE, FUTURE GROWTH AND FORECAST 2024–2030 (Nov. 2025), *available at* https://www.strategicmarketresearch.com/market-report/turmeric-supplement-market.

has been ranked the "#1 Pharmacist Recommended" vitamin and supplement brand, conveying to consumers that its products are superior in quality, reliability, and efficacy.[28]

50. Defendant represents "For every bottle of vitamins we make, there are several hundred individual checks, inspections and tests completed to verify the quality standards of the product are being consistently met to produce safe and effective products"; and "Our vitamin are backed by science to bring the highest quality supplements. Through extensive nutritional research, our science leadership team aims to enhance nutritional research while providing the best supplements on the market."[29]

51. Defendant's Nature Made brand further reinforces this message of quality and trust through its prominent use of United States Pharmacopeia ("USP") verification claims.[30] Defendant advertises that its Nature Made brand was among the first brands to obtain USP verification for many of its products, including the Turmeric Capsules.[31] The USP seal appearing on these products states that "USP has tested and verified ingredients, potency and manufacturing process," and that USP "sets official standards for dietary supplements."[32] Defendant represents that this certification means the Turmeric Capsules are "tested for purity and potency by the U.S. Pharmacopeia according to its standards, so you know you're getting

---

[28] *Nature Made® Named Top Vitamin Brand in U.S. News & World Report's 2025 Survey with Eight #1 Rankings*, Pharmavite (July 8, 2025) (citing U.S. News & World Report, 2025 Best OTC Medicine & Health Products), *at* https://www.pharmavite.com/news/2025/07/nature-made-named-top-vitamin-brand-in-u-s-news-world-reports-2025-survey-with-eight-1-rankings/#:~:text=Ranked%20as%20the%20%231%20Pharmacist,criteria%20for%20purity%20and%20potency (last visited May 29, 2026).

[29] *Nature Made Quality,* Nature Made®, *at* https://www.naturemade.com/pages/nature-made-quality (last visited May 29, 2026).

[30] Pharmavite, *supra* n.28.

[31] *Id.*

[32] *Id.*

the good stuff."[33] Through these representations, Defendant conveys that its Nature Made products meet rigorous, independent scientific and quality standards.[34]

52. Defendant also promotes its Nature Made products through third-party endorsements and rankings. For example, *U.S. News & World Report* ranked Nature Made products among its 2025 "Best OTC Medicine & Health Products," further reinforcing to consumers that Nature Made products are among the highest-quality and most reliable options available.[35]

53. These rankings were based on surveys conducted in partnership with The Harris Poll, which included hundreds of U.S.-based pharmacists and dermatologists across numerous product categories.[36] In those rankings, Nature Made was named the #1 brand in multiple categories, including Best Vitamin Brands, Best Turmeric Supplements, Best Vitamin D Supplements, Best Prenatal Vitamins, and others. [37] These accolades further communicate to consumers that Nature Made products are widely endorsed by medical professionals and are superior to competing products[38]

54. Defendant explicitly represents that its Nature Made products are grounded in science and research. Its marketing materials state that its products are made with "high-quality ingredients" and are "backed by 50 years of research, science, and innovation," and that it develops "science-backed solutions" tailored to consumers' health needs[39]:

---

[33] *About Nature Made,* Nature Made®, *at* https://www.naturemade.com/pages/about-us (last visited May 29, 2026).

[34] Pharmavite, *supra* n.28.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Nature Made, *supra* n.33.



## Science-Based Wellness

Pharmavite sets the benchmark in nutrition science. Our product development is grounded in vetted scientific evidence and rigorous claim substantiation. We collaborate with leading institutions to develop and research new products that deliver meaningful nutritional benefits. Our partnerships, with organizations like Nuritas and University College Cork, demonstrate our commitment to advancing scientific research that can positively impact health outcomes.

[40]

55. Defendant also promises that its Nature Made products meet the highest standards of quality. Defendant represents that it "go[es] the extra step" to ensure its vitamins and supplements are USP-verified and emphasizes that such verification means products have been tested for purity and potency according to established standards, so consumers can be confident they are "getting the good stuff."[41]

56. In addition, Defendant dedicates substantial portions of its Nature Made website and marketing materials to reinforcing its purported scientific credibility, including pages highlighting that its products are "backed by research and top-notch expertise," and "[o]n staff we have PhDs, a Naturopathic Doctor, and Registered Dietitians that drive innovation, and lead health and wellness education"[42]

57. The website contains pages featuring profiles of doctors, dietitians, and other purported experts. These representations are intended to, and do, convey that its Nature Made

[40] *Trust*, Pharmavite, *at* https://www.pharmavite.com/trust/ (last visited May 29, 2026).

[41] *About Nature Made,* Nature Made®, *at* https://www.naturemade.com/pages/about-us (last visited May 29, 2026).

[42] *Id.*

products are developed, validated, and supported by rigorous scientific research and professional expertise.[43]

58. Through these uniform and pervasive representations, Defendant positions its Nature Made brand as a premium, scientifically validated brand whose products are trustworthy, high-quality, and effective—representations that are material to reasonable consumers in deciding whether to purchase Nature Made products, including the Turmeric Capsules.

59. Defendant markets its Turmeric Capsules nationwide in pharmacies, grocery stores, and online retailers. The Turmeric Capsules are widely available and purchased by hundreds of thousands—if not millions—of consumers.

60. Defendant recognizes that curcumin is responsible for turmeric's health benefits:



**What is Turmeric good for?**

Turmeric benefits really lie in its main active ingredient called curcumin. The curcumin in turmeric is responsible for its vibrant yellow color and provides antioxidant activity that helps neutralize free radicals in the body.†

[44]

61. At the same time, Defendant understands that curcumin's central limitation is its poor absorption. This is evidenced by the fact that Defendant's "Extra Strength Turmeric" contains piperine as an active ingredient to aid bioavailability,[45] and, that its "High Absorption Turmeric" product, which while containing lower proportions of curcuminoids, includes

---

[43] *Meet Our Team of Experts*, Nature Made®, *at* https://www.naturemade.com/pages/experts (last visited May 29, 2026).

[44] *Id.*

[45] *Turmeric Extra Strength 1000 mg (950 mg Curcuminoids) Per Serving Capsules*, Nature Made®, *at* https://www.naturemade.com/products/turmeric-extra-strength-1000-mg-capsules?variant=41242157645963 (last visited May 29, 2026).

additives—specifically, in a formulation called TurmXTRA® 60N—to render the curcumin it contains bioavailable.[46]

62. Turmeric Capsules are advertised to have at least 47.5 mg of curcuminoids per capsule, that out of various common spices "turmeric has one of the highest antioxidant activities," and, as represented to consumers directly on the bottle, they "provide[] antioxidant benefits."[47] Nonetheless, the Defendant actively concealed the Turmeric Capsules lack necessary additives to allow for absorption of the curcumin that Defendant acknowledges has the ability to provide those benefits.




63. Defendant's Nature Made website similarly represents that the Turmeric Capsules "contain[] 500 mg of turmeric . . . due to its antioxidant benefits" and "provide[] antioxidant activity that helps neutralize free radicals in the body."[48]

---

[46] *Turmeric Curcumin High Absorption 250 mg Capsules*, Nature Made®, *at* https://www.naturemade.com/products/turmeric-high-absorption-capsules?variant=43040150192267 (last visited May 29, 2026).

[47] *Id.*

[48] *Turmeric (500 mg Curcuminoids) Per Serving Capsules*, Nature Made®, *at* https://www.naturemade.com/products/turmeric-

64. When a consumer purchases Defendant's Turmeric Capsules, the consumer reasonably believes that ingesting them will provide antioxidant benefits. No reasonable consumer reads the label and expects that the product has no antioxidant benefits and that the "active ingredient" cannot be absorbed by the body. In other words, they do not expect to purchase Turmeric Capsules that cannot physiologically deliver the advertised results.

**1. "Other Ingredients" Do Not Aid in Bioavailability**

65. The "other ingredients" in the Turmeric Capsules—such as cellulose gel and hypromellose—are structural excipients and do not aid absorption.

66. "Other ingredients" as defined by federal regulations include additives that do not have a functional effect in the final food.[49]

67. These "non-dietary ingredients [include] binders, excipients, and preservatives."[50]

68. The cellulose gel in the capsule is mainly as a filler, binder, or flow agent to help bulk up the capsule so it fills properly, keeps powder from clumping, and improves manufacturing consistency and helps the capsule hold its shape.

69. The Hypromellose is a vegetarian capsule that holds turmeric powder. After it dissolves in the stomach, it is out of the picture. It does not affect shelf life or bioavailability. It is simply structural.

---

curcumin?queryID=5b880d17163866b9fc4aa32865909324&s=1&p=1&variant=17776078061639 (last visited May 29, 2026).

[49] 21 C.F.R. § 101.4 ("(g) When present, the ingredient list on dietary supplement products shall be located immediately below the nutrition label, or, if there is insufficient space below the nutrition label, immediately contiguous and to the right of the nutrition label and shall be preceded by the word "Ingredients," unless some ingredients (i.e., sources) are identified within the nutrition label in accordance with § 101.36(d), in which case the ingredients listed outside the nutrition label shall be in a list preceded by the words "Other ingredients." Ingredients in dietary supplements that are not dietary ingredients or that do not contain dietary ingredients, such as excipients, fillers, artificial colors, artificial sweeteners, flavors, or binders, shall be included in the ingredient list.").

[50] DIETARY SUPPLEMENTS: OVERVIEW, PRACTICAL LAW PRACTICE NOTE w-031-5972, Westlaw.

70. But the truth is, the Turmeric Capsules neither support nor provide these benefits, as curcumin alone cannot be readily absorbed by the body.

**2. Defendant Charges a Premium for Its Advertised Benefits**

71. Defendant's Turmeric Capsules contain "at least 47.5 mg total curcuminoids per capsule."[51] Turmeric containing curcumin is sold in the grocery stores in the United States as a spice, typically in powder form. A teaspoon of turmeric powder contains an average of 200 mg of curcumin.[52] Thus, one teaspoon of turmeric powder typically provides nearly four times the curcuminoids in Defendant's Turmeric Capsules. As depicted in the chart below, ground turmeric is inexpensive and even premium organic offerings are significantly cheaper by dose than the Turmeric Capsules sold by Nature Made.

| **Turmeric Product** | **Price[53]** | **Per dose[54]** |
|---|---|---|
| Turmeric Capsules (60 Capsules) | $13.99 | $0.233 |
| 365 by Whole Foods Market, Organic Turmeric Superfood Powder, 4 oz (~34.5 tsp) | $5.99 | $0.041 |
| McCormick Organic Ground Turmeric 13.25 oz (~114.5 tsp) | $12.25 | $0.025 |
| Amazon Grocery, Ground Turmeric, 2.75 oz (~23.7 tsp) | $2.62 | $0.026 |
| Simply Organic Ground Turmeric Root, 2.38 oz (~20.5 tsp) | $5.09 | $0.059 |

---

[51] *Supra* n. 48. Note: curcumin is simply a type of curcuminoid.

[52] Committee on Toxicity, Exposure Assessment: Statement on the Potential Risk to Human Health of Turmeric and Curcumin Supplements, at ¶ 78, Dec. 9, 2024, *available at* https://cot.food.gov.uk/print/pdf/node/13046.

[53] Prices sourced form Amazon.com (as of April 8, 2026), other than the Turmeric Capsules, which are priced based on list price set forth at https://www.naturemade.com/products/turmeric-curcumin?p=1&queryID=a94ea817e83f19e0c285edcaab40b129&variant=17776078061639 (last visited May 29, 2026).

[54] Calculated by assuming 200 mg of curcumin per tsp of ground turmeric and 8.625 tsp of ground turmeric per ounce where one dose equals the 47.5 mg of total curcuminoids guaranteed in each capsule of Defendant's Turmeric Capsules.

72. Many of Nature Made's competitors sell turmeric with bioabsorbable curcumin containing the necessary additives or delivery systems to make their products bioavailable and sell their thus superior products for a lower price.

73. Costco's Kirkland brand includes black pepper and sells for $0.13 cents per capsule (with equivalent dose) (or $43.99 per 320-capsule bottle):[55]




**Supplement Facts**
Serving Size 2 Vegetarian Capsules
Servings Per Container 160

| Amount Per Serving | % Daily Value |
|---|---|
| Turmeric (*Curcuma longa*) root extract 1000 mg (Standardized to 95% curcuminoids, 950 mg) | * |
| Black Pepper (*Piper nigrum*) fruit extract 10 mg (Standardized to 95% piperine, 9.5 mg) | * |

* Daily Value not established.

74. CVS's Turmeric Complex sells for $0.12 per capsule (or $15.19 per 120-capsule bottle) and similarly contains black pepper:[56]

---

[55] *Kirkland Signature Turmeric 1000 mg, 320 Vegetarian Capsules*, Costco Wholesale Corp., *at* https://www.costco.com/p/-/kirkland-signature-turmeric-1000-mg-320-vegetarian-capsules/4000257742 (last visited Mar. 29, 2026).

[56] *CVSHealth Turmeric Complex 500 mg, 120 Capsules*, CVS Pharmacy Inc., *at* https://www.cvs.com/shop/cvs-turmeric-complex-capsules-120-ct-prodid-1150442 (last visited Mar. 29, 2026). As of the date of this complaint this product was offered as "Buy 1, get 1 50% off" making the per capsule price 0.9 cents per capsule.







75. Walgreens Turmeric Complex contains BioPerine, a form of Piperine which aids bioavailability, and retails for $0.9 per capsule (or $29.99 per twin pack 150-capsule bottles).[57]

[57] *Walgreens Turmeric Complex 500 mg, 300 Capsules*, Walgreens Co., *at* https://www.walgreens.com/store/c/walgreens-enhanced-absorption-turmeric-complex-500-mg-with-bioperine-5-mg-capsules/ID=300429342-product (last visited Mar. 29, 2026).




76. A side-by-side comparison demonstrates that Nature Made commands a premium price for an objectively inferior product.

| **Product Name** | **Capsules** | **Price[58]** | **Price per 500 mg Capsule** | **Additive to Aid Bioavailability** |
|---|---|---|---|---|
| Turmeric Capsules | 60 | $13.99 | $0.23 | No |
| Kirkland Signature Turmeric | 320 | $42.99 | $0.13 | Yes |
| CVS Turmeric Complex | 120 | $15.19 | $0.12 | Yes |
| Walgreens Turmeric Complex | 150 | $19.99 | $0.13 | Yes |

## IV. CLASS ACTION ALLEGATIONS

77. Plaintiffs bring this action individually and on behalf of the following Classes, pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (3), and (c)(4):

**Nationwide Class**: All individuals who purchased Turmeric Capsules within the relevant limitations periods in the United States not through www.naturemade.com (the "Class").

[58] All prices sourced links as referenced in ¶¶ 71-75 above.

**California Class**: All individuals who purchased the Turmeric Capsules within the relevant limitations periods in California not through www.naturemade.com (the "California Subclass").

**New York Class**: All individuals who purchased the Turmeric Capsules within the relevant limitations periods in New York not through www.naturemade.com (the "New York Subclass").

**New Jersey Class**: All individuals who purchased the Turmeric Capsules within the relevant limitations periods in New Jersey not through www.naturemade.com (the "New Jersey Subclass," with the California Subclass, New York Class and the Class, the "Classes").

78. Excluded from the proposed Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest.

79. Plaintiffs reserve the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

80. The claims of all Class members derive directly from a single course of conduct by Defendant. Defendant engaged and continues to engage in uniform and standardized conduct toward the putative Class members. Defendant does not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual Class members.

81. Certification of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

82. **Numerosity**: The members of the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class members in a single action will provide substantial benefits to the parties and Court.

83. **Ascertainability**: The Classes are ascertainable because their members can be readily identified using business records, and other information kept by Defendant in the usual course of business and within their control or Plaintiffs and the Classes themselves. Plaintiffs anticipate providing appropriate notice to the Classes to be approved by the Court after class certification, or pursuant to court order.

84. **Commonality and Predominance**: Common questions of law and fact exist as to all Class members. These questions predominate over the questions affecting only individual Class members. Questions of law and fact common to Plaintiffs and the Classes include, without limitation:

a. Whether the misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations and Omissions, were misleading;

b. Whether the misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations and Omissions, were unfair;

c. Whether the misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations and Omissions, were material to a reasonable consumer;

d. Whether Defendant had knowledge that the misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations and Omissions, were material, false, deceptive, and misleading;

e. Whether Defendant owed a duty to disclose;

f. Whether Defendant knew or should have known the Turmeric Capsules could not be readily absorbed by consumers;

g. Whether Defendant failed to disclose that the Turmeric Capsules failed to contain any additives designed to improve bioavailability;

h. Whether Defendant had exclusive or superior knowledge of the Omissions;

i. Whether Plaintiffs could have reasonably discovered the Omissions;

j. Whether Defendant engaged in unfair trade practices;

k. Whether Defendant engaged in false advertising;

l. Whether Defendant made fraudulent Omissions;

m. Whether Defendant made fraudulent misrepresentations by omission;

n. Whether Plaintiffs and the Class members are entitled to actual, statutory, and punitive damages; and

o. Whether Plaintiffs and the Class members are entitled to declaratory and injunctive relief.

85. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of all the Class members. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

86. **Typicality**: Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs and the Class members sustained damages as a result of Defendant's uniform wrongful conduct during transactions with them. Plaintiffs and all Class members are similarly affected by Defendant's wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class members.

87. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and there are no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the Class members.

88. **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class members. The injuries suffered by each Class Member are

relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendant's conduct. Absent a class action, it would be virtually impossible for the Class members to obtain effective relief from Defendant. Even if Class members could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the common legal and factual issues presented here. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

89. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief**: This action may properly be maintained as a class action because:

a. the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendant; and

b. the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Defendant acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

90. **Policies Generally Applicable to the Classes**: This case is appropriate for certification because Defendant acted or refused to act on grounds generally applicable to Plaintiffs and the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards Class members and making final injunctive

relief appropriate with respect to the Classes as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiffs' challenge to those practices hinges on Defendant's conduct with respect to the Classes as a whole, not on individual facts or law applicable only to Plaintiffs.

## FIRST CAUSE OF ACTION

**Violations of California's Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code § 17200 et seq.**

**(On Behalf of the Class)**

91. Plaintiffs incorporate by reference and reallege each and every allegation contained above in paragraphs 1-90 and restate them as if fully set forth herein.

92. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

93. A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

94. As set forth herein, Defendant's material misrepresentations, partial misrepresentations, and omissions about their Turmeric Capsules are likely to deceive reasonable consumers and the public. Specifically, Defendant's misrepresentations, partial misrepresentations, and omissions, active concealment, and other deceptive, unfair, and misleading conduct described herein misleadingly marketed to reasonable consumers that the Turmeric Capsules would provide health benefits that they are not capable of providing.

95. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

96. As alleged herein, Defendant deceptively advertised its Turmeric Capsules with misrepresentations, partial misrepresentations, and omissions, such that Defendant's actions violate at least the CLRA, California Business and Professions Code section 1750 et seq.,

California's False Advertising Law, California Business and Professions Code section 17500 et seq., and any other applicable laws described herein.

97. A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

98. Defendant's conduct with respect to the packaging, advertising, marketing, and sale of the Turmeric Capsules was unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

99. Defendant's conduct with respect to the packaging, advertising, marketing, and sale of the Turmeric Capsules is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to the CLRA.

100. Defendant's conduct with respect to the packaging, advertising, marketing, and sale of the Turmeric Capsules is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves can reasonably avoid. Specifically, the increase in profits obtained by Defendant through the misleading packaging, advertising, marketing and sale of the Turmeric Capsules does not outweigh the harm to Plaintiffs and members of the Class who were deceived into purchasing the Turmeric Capsules unaware that the Turmeric Capsules contain no absorption-enhancing additive necessary to provide the advertised health benefits. Consumers could not have reasonably avoided the harm because this would have required that they conduct their own research to understand that the Turmeric Capsules would not provide health benefits that were readily absorbable by the body, which is not a reasonable expectation. Further, the harm could have easily been avoided by Defendant as the costs would be minimal to indicate to consumers that the Turmeric Capsules were not readily absorbable without combination with other additives to increase bioavailability.

101. Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Turmeric Capsules to unsuspecting consumers.

102. The Plaintiffs and other members of the Class are likely to continue to be damaged by Defendant's unlawful, unfair, and/or fraudulent acts or practices because Defendant continues to disseminate misleading information. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

103. Defendant's conduct caused and continues to cause substantial injury to the Plaintiffs and the other members of the Class, who suffered injury in fact as a result of Defendant's unlawful conduct.

104. Defendant charged, and the Plaintiffs and Class Members paid, a premium price for the Turmeric Capsules despite the availability of comparable, lesser-priced protein powder products from other manufacturers.

105. In accordance with California Business & Professions Code section 17203, the Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

106. The Plaintiffs also seek an order for the restitution of all monies from the sale of the Turmeric Capsules that were unjustly acquired through acts of unlawful competition.

107. Because the Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the CLRA or UCL's "fraudulent" prong, the Plaintiffs' legal remedies are inadequate to fully compensate them for all of Defendant's behavior.

## <u>SECOND CAUSE OF ACTION</u>

**Violations of California's False Advertising Law ("FAL")**

**Cal. Bus. & Prof. Code § 17500 et seq.**

**(On Behalf of the Class)**

108. The Plaintiffs incorporate by reference and reallege each and every allegation contained above in paragraphs 1-90 and restate them as if fully set forth herein.

109. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services … to make or disseminate or cause to be made or disseminated …any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

110. As alleged herein, Defendant misleadingly marketed to reasonable consumers that the Turmeric Capsules would provide health benefits that were readily absorbable by the body. The Plaintiffs and members of the Class suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the Turmeric Capsules in reliance on Defendant's false and misleading marketing claims stating or suggesting that the Turmeric Capsules would provide health benefits.

111. Defendant's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant advertised the Turmeric Capsules in a manner that is untrue and misleading, which Defendant knew or reasonably should have known.

112. Defendant profited from the sale of the falsely and deceptively advertised Turmeric Capsules to unsuspecting consumers, including the Plaintiffs and the Class.

113. Defendant's acts and practices deceived the Plaintiffs and members of the Class at large. The Plaintiffs and members of the Class relied on Defendant's misleading and deceptive representations.

114. Through their unfair acts and practices, Defendant unlawfully obtained money from the Plaintiffs and the Class. As such, the Plaintiffs request that this Court order Defendant to restore this money to the Plaintiffs and all members of the Class. The Plaintiffs further seek an award of attorneys' fees and costs under California Code of Civil Procedure section 1021.5.

115. Pursuant to California Business and Professions Code section 17535, the Plaintiffs, on behalf of themselves and members of the Class, seek an order enjoining Defendant

from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth herein.

116. Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA, and restitution is not limited to returning to the Plaintiffs and members of the Class monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies under the CLRA and commercial code are more limited than the equitable remedies under the FAL, and are therefore inadequate.

## THIRD CAUSE OF ACTION

**Violations of California's Consumers Legal Remedies Act (the "CLRA")**

**Cal. Civ. Code § 1750, *et seq*.**

**(On Behalf of the Class)**

117. The Plaintiffs incorporate by reference and reallege each and every allegation contained above in paragraphs 1-90 and restate them as if fully set forth herein.

118. The Plaintiffs and each member of the Class are consumers within the meaning of California Civil Code section 1761(d) and have engaged in transactions within the meaning of California Civil Code sections 1761(e) and 1770.

119. Defendant is a "person" within the meaning of California Civil Code section 1761(c).

120. The Turmeric Capsules are "goods" within the meaning of California Civil Code sections 1761(a).

121. The Plaintiffs and each Class Member's purchases of the Turmeric Capsules constituted a "transaction" as that term is defined in California Civil Code section 1761(e).

122. Defendant's conduct alleged herein violates the following provisions of the CLRA:

a. California Civil Code section 1770(a)(5), by failing to make any mention of the fact that the Turmeric Capsules could not provide the stated benefits because they failed to include necessary additives to make them bioavailable;

b. California Civil Code section 1770(a)(7), by knowingly, recklessly, and/or intentionally representing that the Turmeric Capsules were of a particular standard, quality, or grade, when they were of another;

c. California Civil Code section 1770(a)(9), by knowingly, recklessly, and/or intentionally advertising the Turmeric Capsules with intent not to sell them as advertised; and

d. California Civil Code section 1770(a)(16), by representing that the Turmeric Capsules have been supplied in accordance with previous statements when they have not.

123. Defendant profited from the sale of the misleadingly, falsely, deceptively, and unlawfully advertised Turmeric Capsules to unsuspecting consumers. Specifically, Defendant's misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations, Omissions, active concealment, and other deceptive, unfair, and misleading conduct described herein misleadingly marketed to reasonable consumers that the Turmeric Capsules would provide health benefits that were readily absorbable by the body.

124. Defendant made both misrepresentations and partial misrepresentations, including the Misrepresentations, that required it to fully disclose that the Turmeric Capsules could not provide the stated benefit absent the inclusion of additives to make them bioavailable.

125. Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

126. Plaintiffs Spencer and Pilon sent notice of the violations herein to Defendant pursuant to the CLRA on May 29, 2026.

127. The Plaintiffs and members of the Class have suffered harm and seek damages and injunctive relief under the CLRA.

**FOURTH CAUSE OF ACTION**

**Violations of the New Jersey Consumer Fraud Act**

**(On Behalf of the New Jersey Plaintiff Guenther and the New Jersey Subclass)**

128. Plaintiff Guenther (the "New Jersey Plaintiff") incorporates by reference and realleges each and every allegation contained above in paragraphs 1-90 and restates them as if fully set forth herein.

129. Defendant is a "person" as defined in the New Jersey Consumer Fraud Act ("NJCFA"). N.J.S.A. § 56:8-1(d).

130. The Turmeric Capsules are "merchandise" as defined by the NJCFA. N.J.S.A. § 56:8-1(c).

131. The NJCFA states in pertinent part: "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practices...." N.J.S.A. §56:8-2.

132. While engaging in trade or commerce within the State of New Jersey during the time period relevant hereto, Defendant misled the New Jersey Plaintiff, New Jersey Subclass members, and other consumers about the Turmeric Capsules.

133. As alleged herein, Defendant misleadingly marketed to reasonable consumers that the Turmeric Capsules would provide health benefits that were readily absorbable by the body. The Plaintiffs and members of the Class suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the Turmeric Capsules in reliance on

Defendant's false and misleading marketing claims stating or suggesting that the Turmeric Capsules would provide health benefits.

134. The New Jersey Plaintiff and the New Jersey Subclass have been and continue to be injured as a direct and proximate result of Defendant's violations of the NJCFA.

135. The New Jersey Plaintiff and the New Jersey Subclass are entitled to pursue a claim against Defendant pursuant to New Jersey Statutes sections 56:8-2.11, 56:8-2.12 and/or 56:8-19 for damages, treble damages, equitable relief, and attorney's fees and costs to remedy Defendant's violations of the NJCFA.

## FIFTH CAUSE OF ACTION

**Violations of New York's Deceptive Acts and Practices,**

**N.Y. Gen. Bus. Law § 349**

**(On Behalf of the New York Plaintiff Browne and the New York Subclass)**

136. Plaintiff Browne (the "New York Plaintiffs") incorporates by reference and reallege each and every allegation contained above in paragraphs 1-90 and restate them as if fully set forth herein.

137. New York General Business Law ("GBL") section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

138. Defendant conducts consumer-oriented business and trade in its advertising and sale of goods throughout New York within the meaning of GBL section 349.

139. Defendant violated GBL section 349 by deceptively and misleadingly misrepresenting and omitting that the Turmeric Capsules would provide health benefits that were readily absorbable by the body. The New York Plaintiff and members of the Class suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the Turmeric Capsules in reliance on Defendant's false and misleading marketing claims stating or suggesting that the Turmeric Capsules would provide health benefits.

140. Defendant's misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein, intentionally marketed that the Turmeric Capsules were of a particular standard, grade, or quality, and suitable for use when they in fact were not bioavailable.

141. Defendant's misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein, were directed at the consumer public at-large as they repeatedly occurred in the course of Defendant's business and were capable of deceiving a substantial portion of the consuming public.

142. The facts misrepresented, concealed or not disclosed by Defendant were material in that the New York Plaintiffs and New York Subclass, and other reasonable consumers, would have considered them important in deciding whether to purchase the Turmeric Capsules. Had the New York Plaintiff and members of the New York Subclass known the Turmeric Capsules did not have the quality, ingredients, standards, and suitability for use as advertised by Defendant, they would not have purchased the Turmeric Capsules or paid a premium price.

143. Defendant charged, and the New York Plaintiff and New York Subclass paid, a premium price for the Turmeric Capsules despite the availability of comparable, lesser-priced turmeric supplements products from other manufacturers.

144. Defendant alone possessed the information that was material to the New York Plaintiff and New York Subclass and failed to disclose such material information to consumers.

145. Defendant engaged in and continues to engage in deceptive conduct in violation of GBL section 349.

146. As described herein, Defendant mispresented that the Turmeric Capsules would provide health benefits that were readily absorbable by the body. The New York Plaintiff and members of the Class suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the Turmeric Capsules in reliance on Defendant's false and misleading marketing claims stating or suggesting that the Turmeric Capsules would provide health benefits

147. The misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein, caused the New York Plaintiff and New York Subclass to suffer injury in the form of actual damages when they purchased the Turmeric Capsules that were worth less than the price paid and that they would not have purchased at all had they known that the Turmeric Capsules were not bioavailable.

148. Defendant intended for the New York Plaintiff and New York Subclass to rely on its misrepresentations, partial misrepresentations, and omissions, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein, regarding the Turmeric Capsules' quality, ingredients, standards, and suitability for use when purchasing the Turmeric Capsules, unaware of the undisclosed material facts.

149. GBL section 349 applies to the New York Plaintiff and New York Subclass because the State of New York has an interest in regulating business conduct in the region.

150. Defendant's conduct has caused and is causing immediate and irreparable injury to the New York Plaintiff and New York Subclass and will continue to damage both the New York Plaintiff and New York Subclass and deceive the public unless enjoined by this Court.

151. As a direct and proximate result of these violations, the New York Plaintiff, New York Subclass, and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from further omitting the true quality, ingredients, standards, and suitability for use of the Turmeric Capsules.

152. Pursuant to GBL sections 349(h) and 350-e, New York Plaintiff and New York Subclass seek injunctive relief, declaratory relief, full refund, compensatory and punitive damages, actual damages or $50 (whichever is greater), statutory and treble damages, and attorneys' fees.

## SIXTH CAUSE OF ACTION

**Violations Of New York's False Advertising Law, N.Y. Gen. Bus. Law § 350**

**(On Behalf of The New York Plaintiff Browne And New York Subclass)**

153. The New York Plaintiff incorporates by reference and realleges each and every allegation contained above in paragraphs 1-90 and restate them as if fully set forth herein.

154. GBL section 350 prohibits false advertising in the conduct of any business, trade, or commerce.

155. Pursuant to GBL section 350, false advertising is defined as "advertising, including labeling, or a commodity… if such advertising is misleading in a material respect. … [considering] representations made by statement, word [or] design [and] the extent to which the advertising fails to reveal facts material in the light of such representations."

156. Defendant knew or should have known the Turmeric Capsules did not have the quality, ingredients, standards, and suitability for use as described above.

157. Defendant purposely misrepresented, actively concealed, and did not disclose material facts to consumers, such as the New York Plaintiff and New York Subclass.

158. The facts misrepresented, concealed or not disclosed by Defendant were material in that the New York Plaintiff, New York Subclass, and other reasonable consumers would have considered them when deciding whether to purchase the Turmeric Capsules. Had the New York Plaintiff and members of the New York Subclass known the Turmeric Capsules did not have the quality, ingredients, and standards as advertised by Defendant, they would not have purchased the Turmeric Capsules or paid a premium price.

159. Defendant charged, and the New York Plaintiff and New York Subclass paid, a premium price for the Turmeric Capsules despite the availability of comparable, lesser-priced protein powder products from other manufacturers.

160. Defendant's conduct caused the New York Plaintiffs and New York Subclass Members to suffer actual damages when they purchased the Turmeric Capsules that were worth

less than the price paid and that they would not have purchased at all had they known the Turmeric Capsules were not bioavailable.

161. As a direct and proximate result of Defendant's violation of GBL section 350, the New York Plaintiff and New York Subclass have been injured, and that harm will continue unless Defendant is enjoined from further omitting the true quality, ingredients, standards, and suitability of the Turmeric Capsules.

162. Defendant's conduct has also substantially injured the public, as consumers across New York were exposed to and relied upon Defendant's advertising while unaware of material Omissions—specifically, the failure to disclose that the Turmeric Capsules could not provide the promised health benefits. Defendant's omission of this critical safety information deprived consumers of the ability to make informed purchasing decisions and created a false impression that the Turmeric Capsules would provide antioxidant and other health benefits. This deception not only caused economic harm but undermined public trust in products that claim to be safe and effective for everyday use.

163. Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

164. Pursuant to GBL section 350-e, the New York Plaintiff and New York Subclass seek injunctive relief, declaratory relief, full refund, actual and punitive damages or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

**<u>SEVENTH CAUSE OF ACTION</u>**

**Violations of Breach of Express Warranty**

**(On Behalf of Plaintiffs and the Nationwide Class)**

165. Plaintiffs incorporate by reference and reallege each and every allegation contained above in paragraphs 1-90 and restate them as if fully set forth herein.

166. Defendant expressly warranted that the Turmeric Capsules were fit for their intended purpose. Defendant made these representations through statements on the Turmeric Capsules packaging, advertising, marketing, and other promotional materials, including:

a. "#1 Pharmacist Recommended Herbal Supplement Brand";

b. "Sourced from high quality ingredients";

c. Nature Made goes the "extra step to ensure our vitamins and supplements are USP verified";

d. That they have been "tested for purity and potency by the U.S. Pharmacopeia according to its standards, so you know you're getting the good stuff";

e. "On staff we have PhDs, a Naturopathic Doctor, and Registered Dietitians that drive innovation, and lead health and wellness education"

f. "For every bottle of vitamins we make, there are several hundred individual checks, inspections and tests completed to verify the quality standards of the product are being consistently met to produce safe and effective products"; and

g. "Our vitamin are backed by science to bring the highest quality supplements. Through extensive nutritional research, our science leadership team aims to enhance nutritional research while providing the best supplements on the market."

167. Defendant warranted that the Turmeric Capsules:

a. "Provide[] antioxidant activity;" and

b. "help[] neutralize free radicals in the body."

168. These representations formed part of the basis of the bargain between Plaintiffs, the Nationwide Class members, and Defendant.

169. Plaintiffs and Nationwide Class members reasonably relied on Defendant's express warranties in purchasing the Turmeric Capsules and had no way of knowing they failed to contain additives needed to make them bioavailable.

170. Defendant breached its express warranties because the Turmeric Capsules failed to conform to the representations made by Defendant, that the Turmeric Capsules were effective and of the highest quality when in fact they could not provide the represented health benefits.

171. Defendant had knowledge of, or should have known, the Turmeric Capsules did not conform to its express warranties, yet Defendant continued to sell the Turmeric Capsules, thereby willfully breaching its express warranties and misleading consumers, including Plaintiffs and the Nationwide Class.

172. As a direct and proximate result of Defendant's breach of express warranty, Plaintiffs and Nationwide Class members have suffered economic damages, including the purchase price of the Turmeric Capsules.

173. On May 29, 2026, Plaintiffs Benjamin Spencer, Damany Browne, Shaun Pilon, and Lynn Guenther provided Defendant with formal notice pursuant to the Uniform Commercial Code section 2-607(3)(a) that it breached its express and implied warranties to the consumers in connection with its advertising and sale of the Turmeric Capsules.

## EIGHTH CAUSE OF ACTION

**Violations of Breach of Implied Warranty of Merchantability**

**(On Behalf of Plaintiffs and the Nationwide Class)**

174. Plaintiffs incorporate by reference and reallege each and every allegation contained above in paragraphs 1-90 and restate them as if fully set forth herein.

175. Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Nationwide Class.

176. There was a sale of goods from Defendant to Plaintiffs and the members of the Nationwide Class.

177. At all times herein, Defendant manufactured and sold the Turmeric Capsules and, prior to the time the Turmeric Capsules were purchased by Plaintiffs and the Nationwide Class, impliedly warranted that the Turmeric Capsules were of merchantable quality and fit for their ordinary use.

178. Plaintiffs and the Nationwide Class relied on these implied warranties when they purchased the Turmeric Capsules.

179. The Turmeric Capsules were not fit for their ordinary use as they were manufactured without additives to make them bioavailable which was not identified on the packaging.

180. These promises became part of the basis of the bargain between Defendant and Plaintiffs and members of the Nationwide Class, and thus constituted implied warranties.

181. Defendant breached the implied warranties by selling the Turmeric Capsules that could not provide the stated health benefits because the curcumin could not be readily absorbed.

182. Defendant was on notice of this breach as it was aware of the failure to include the necessary additives to make the Turmeric Capsules bioavailable.

183. Privity exists because Defendant impliedly warranted to Plaintiffs and the members of the Nationwide Class that the Turmeric Capsules were healthy; however, Defendant failed to mention or disclose that the Turmeric Capsules were manufactured without the necessary components to make the Turmeric Capsules bioavailable.

184. As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs and the Nationwide Class suffered actual damages by: (1) paying a premium price for the Turmeric Capsules that they reasonably believed would provide the represented health benefits; (2) purchasing the Turmeric Capsules they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving the Turmeric Capsules that were worthless because they were manufactured without additives to make them bioavailable.

185. Plaintiffs, on behalf of themselves and the Nationwide Class, seek actual damages for Defendant's failure to deliver goods that conform to its implied warranties and resulting breach.

186. On May 29, 2026, Plaintiffs Benjamin Spencer, Damany Browne, Shaun Pilon, and Lynn Guenther provided Defendant with formal notice pursuant to the Uniform Commercial Code section 2-607(3)(a) that it has breached its express and implied warranties to consumers in connection with its advertising and sale of the Turmeric Capsules.

## **<u>NINTH CAUSE OF ACTION</u>**

### **Unjust Enrichment**

### **(On Behalf of Plaintiffs and the Classes)**

187. Plaintiffs incorporate by reference and reallege each and every allegation contained above in paragraphs 1-90 and restate them as if fully set forth herein.

188. Plaintiffs and the Classes conferred substantial benefits on Defendant through their purchases of the Turmeric Capsules.

189. Defendant accepted and retained these payments, even though it misrepresented the quality and characteristics of the Turmeric Capsules. Defendant's retention of this benefit is unjust because it knowingly marketed and sold Turmeric Capsules representing they would provide health benefits when in fact they were not bioavailable and thus could not provide the stated benefits, and, therefore, Defendant's representations were made in violation of the law.

190. Defendant either knew or should have known that the payments rendered by Plaintiffs were given and received with the expectation that the Turmeric Capsules would provide the represented health benefits. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

191. Defendant was obligated to disclose that the Turmeric Capsules failed to contain additives designed to make them bioavailable because:

a. Defendant had exclusive knowledge that the Turmeric Capsules were not bioavailable; and

b. Defendant actively concealed from Plaintiffs and the Classes that the Turmeric Capsules would not provide the stated health benefits.

192. Defendant's acceptance and retention of these benefits of the payments from Plaintiffs and the Classes under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiffs and the Classes.

193. It would be unfair for Defendant to keep the money spent without compensating Plaintiffs and the Classes because Defendant misled consumers into believing the Turmeric Capsules were safe, when in fact they were not.

194. Plaintiffs and the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

195. Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, statutory damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendant as follows:

A. Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representative of the Classes, and designating Plaintiffs' counsel as Class Counsel;

B. Awarding Plaintiffs and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C. Awarding Plaintiffs and the Classes appropriate relief, including actual and statutory damages;

D. Awarding Plaintiffs and the Classes exemplary and punitive damages;

E. Granting Plaintiffs and the Classes declaratory and equitable relief, including restitution and disgorgement;

F. Enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

G. Awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

H. Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs as allowable by law;

I. Awarding pre-judgment and post-judgment interest; and

J. Granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 29, 2026

**GRANT & EISENHOFER P.A.**

*/s/ Jennifer Sarnelli*
Jennifer Sarnelli (Cal. Bar No. 242510)
jsarnelli@gelaw.com
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

Elizabeth Graham (Cal. Bar No. 143085)
egraham@gelaw.com
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel: (415) 229-9720

Kelly L. Tucker
(*pro hac vice forthcoming*)
ktucker@gelaw.com
123 Justison Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

**SEEGER WEISS LLP**
STEPHEN A. WEISS, ESQ.
(*pro hac vice* forthcoming)
sweiss@seegerweiss.com
JUSTIN M. SMIGELSKY, ESQ.

(*pro hac vice* forthcoming)
jsmigelsky@seegerweiss.com
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
Fax: (973) 639-9393

*Attorneys for Plaintiffs and the Putative Classes*